___ FILED ___ ENTERED
___ LODGED ___ RECEIVED

SEP 17 2001   PM

AT SEATTLE
CLERK U S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

---

GENESEE SERVICES CORP., a Washington Corporation,

                Plaintiff,

-against-

BRUCE T BERNSTEIN

                Defendant

Case No.: CO1-1297

**AFFIDAVIT OF BRUCE T. BERNSTEIN IN SUPPORT OF THE MOTION TO DISMISS, STAY, OR TRANSFER**

---

STATE OF NEW YORK   )
                           : ss.:
COUNTY OF NEW YORK  )

CV 01-01297 #00000011

I, Bruce T Bernstein, being duly sworn, declare as follows

1      I am the defendant in the above entitled action. I submit this Declaration in Support of the Motion to Dismiss, Stay or Transfer  I have personal knowledge of the facts stated herein

2      At all relevant times I have resided and worked in New York and the surrounding metropolitan area  In May 2000, I was employed as the President of MeesPierson Investments, Inc under an Employment Agreement that ran through December 31, 2001. The offices of MeesPierson at that time were located in Stamford, Connecticut, having been relocated there from midtown Manhattan two years ago  I commuted to work daily from my home in Manhattan

3      Some time in May, 2000, I received a call from Don Morken of Genesee Services asking if I would be interested in meeting with him about the possibility of managing an investment

Doc 92729-1 doc



fund for his group. I believe he got my name from a mutual friend. That month, I traveled to Seattle to meet with him and to be interviewed. The purpose of that meeting was an opportunity for the Genesee people to assess my skills and background, as well as an opportunity for me to learn about their business, their operations and the status of the investment fund, Advantage II, which they considered putting under my management. I was in their offices approximately six hours that day, meeting Morken, Howard Coleman and Michelle Kline.

    4.    Although I was asked during the course of this interview the amount of compensation I was then earning at MeesPierson, there were <u>no negotiations</u>, discussions or even a proposal from Genesee regarding employment. The meeting in Seattle was purely an interview, and preliminary even to any offer of employment. In fact, Don Morken made it very clear that before any offer could be made, they wanted to meet the other member of my investment team, Ray Lang. An interview with Ray was then set up and Ray followed my visit with his own meeting in Seattle about 10 days later. Only after Genesee had interviewed both of us did discussions turn to a proposal of employment for each of us.

    5.    All of such discussions relating to the terms of employment for both myself and Ray took place by telephone and e-mail between Seattle and New York. My employment agreement itself, which is the subject matter of this action, and upon which declaratory judgment is being sought by Genesee, was negotiated between Genesee's counsel in Seattle, Frank Woodruff, and my counsel in New York, Stuart Newman. Once approved by the parties and their respective attorneys, the Agreement was signed in counterpart and signatures exchanged by mail. I was then the new Managing Director of Genesee's affiliate, an offshore hedge fund, Advantage Fund II, Ltd.

6. Once the Agreement was signed, my first assignment as an employee of Genesee was to establish a New York office and hire a staff. During the interviews, the Genesee people made it clear that one of the reasons they were interested in me, in addition to my experience and contacts for potential deal flow, was the fact that I lived and worked in New York. The Seattle group very much wanted my help in establishing a New York base of operations for Genesee. I discovered, however, much to my surprise, that Morken was not willing to commit to a lease of any fixed duration for New York office space. I was instructed to look for temporary office space in New York with no more than a 30-day commitment. On that basis, I rented and opened an office at 153 East 53rd Street, in New York. In addition to Ray Lang and myself, I staffed the New York office with one other employee, Paula Montanaro, as our executive assistant

7. Ray Lang and Paula Montanaro will be important non-party witnesses in this case. Ray Lang will confirm that his interview in Seattle followed the same format as mine, and that the same misrepresentations about Genesee's operations, available cash for investments and the liquidity and status of the Advantage II portfolio, were made to him as well. Ray Lang resides in Long Island, New York.

8. Paula Montanaro will testify to the fact that at every turn, when a decision had to be made, Seattle consistently failed to make a commitment to support the New York office on a long term basis For example, in furnishing the New York office, she was specifically instructed to rent temporary office furniture, rather than purchase furniture and equipment for the office Paula Montanaro resides in Stamford, Connecticut.

9 Another important non-party witness in this action is the director of one of the institutional investors in the fund, Stan Kowalewski of Phoenix Advisers. Mr Kowalewski will

Doc 92729-1 doc

3

testify to concerns he raised with Don Morken shortly after I was employed regarding difficulty he had in getting timely profit and loss reports from Geensee for his stockholders, and the serious concern he had regarding a proposed "dramatic write down" in November of a "troubled company" in the fund's portfolio. This relates to an investment of Advantage II in a company, prior to my being employed, which apparently lost 90% of its value in just seven months, circumstances which lead Kowalewski to suggest possible negligence or malfeasance. Kowalewski, although based in North Carolina, has regular and frequent business contacts in New York By contrast, my understanding is that he is rarely if ever a visitor to Seattle

10 All of the services performed by me once employment commenced, were performed either at the New York office or on visits by me from New York to other parts of the country as arranged by me through the New York office During my employment by Genesee, as I have said above, all communications with Seattle were by telephone and e-mail I did make one trip to Seattle in October 2000, but had no other direct personal contact with the city otherwise

11. As far as my ability to perform the duties assigned to me, and to close the required amount of "qualified investments" in the Advantage Fund II to earn the compensation guaranteed under my employment agreement, I was totally frustrated by lack of cooperation and support from Seattle, and inadequate capital and liquidity in the Advantage Fund II I have referred above to the testimony expected of Stan Kowalewski as to the severity of problems in the Fund's portfolio, and of Paula Montanaro as to the surprisingly weak commitment to New York operations. In addition, as I presented investment opportunities to Seattle for their consideration, and these transactions were consistently rejected by Genesee in Seattle, it soon became clear that Genesee did not have the capital to invest – – contrary to the assurances Ray Lang and I were given when we were being

interviewed for our position   As one indication of this frustrating lack of support and resources to sustain my efforts as Managing Director, see Don Morken's e-mail to me dated January 6, 2001, just four months into my employment (Exhibit A hereto) wherein he said in part·

> "   we have very little surplus cash in the portfolio, and we have to preserve that to meet redemption requests that we know about and others that may come in   If we are fully invested and can not meet redemption requests, we will have no choice but to lock up the fund "

The message could not be more clear.  Mr  Morken thereby closed the door on any possible chance I might have over the remaining twelve months of the employment term to earn my guaranteed compensation

BRUCE T BERNSTEIN

Sworn to before me this
/4 day of September, 2001

NOTARY PUBLIC

STUART B. NEWMAN
Notary Public, State of New York
No. 02NE2882385
Qualified in New York County
Commission Expires June 30, 2003

-----Original Message-----
From: Don Morken [mailto:dmorken@geneseeinv.com]
Sent: Saturday, January 06, 2001 4:46 PM
To: Bruce Bernstein, Ray Lang
Cc: Don Stout; Howard Coleman, Michelle Kline
Subject: RE: Portfolio Concentration and Reg D's Future

Hi Bruce,

If it is any consolation, I share your obvious frustration with the current state of the Reg D business. Liquidity and stock prices are incredibly low, but not just for the smallest companies. The credit squeeze by lenders has raised havoc with the fundamental business plans of a huge number of companies and many of them are not even micro-caps. The IPO window is slammed shut for most companies. Investors are scared and the economy is headed for a full blown recession or at least a severe slowdown. This is, on the surface, not an attractive time to be asking investors to put money into a Reg D fund, even though it may ultimately turn out to have been the best time to invest in some small beaten up companies. In your January 2nd memo you sited eight sources of potential capital for Advantage II, but you indicated that these folks all want to wait "until the markets get more settled."

In terms of the potential KOOL deal, or any other deal for that matter, I am not in favor of moving ahead at this time. There are several reasons: I agree that we need more diversification in the portfolio, even though KOOL is one of the smallest positions now and it has been one of our better positions. Second, we have very little surplus cash in the portfolio, and we have to preserve that to meet redemption requests that we know about and others that may come in. If we are fully invested and can not meet redemption requests, we will have no choice but to lock up the fund. That act, by itself, will likely encourage other investors to request redemption, and this will only serve to compound the problem. Third, even though I share your opinion that we need to move up the latter in terms of credit quality and liquidity, I am not enthusiastic about participating in Reg D transactions with multiple purchasers, unless we know them well and have assurance that they will not do anything that puts us in jeopardy. Our experience has been bad when joining in with buyers that aggressively hedge positions and dump the stock in a reckless manner. I don't want Genesee to be the subject of an article like the one yesterday in Bloomberg, nor do I want us to be sued by some company for alleged stock manipulation. Fourth,

even if we had a boatload of cash, I would be very cautious in deploying it in this environment. I noted in Zanett and Lombardier's November monthly investor's letter that they said they currently had their largest cash balance in the fund's history

Given the current environment and the general high level of apprehension that most people seem to have about investing in an existing portfolio of small, fairly illiquid companies, it may be necessary for us to create a new master portfolio into which all new deals would go  This would necessitate creating a new offshore feeder fund and creating a "Phase III" sub-partnership within Genesee Partners. That way we could set up whatever investment criteria we thought were appropriate, including some limited rights to invest in private companies before they go public. Starting over with a clean slate might be the best plan at this time  The question I have for you is whether the prospective investors you referred to would invest now if they did not have to participate in the current portfolio? Also, I am curious how our friends Wolfgang Flottl and Cynthia Cox would react to a proposal to create a new fund  I will send them an e-mail and see how they feel about this  One concern I have is that both Brown and Simpson and Chau's have received quite a bit of recent publicity and this may have soured Wolfgang on Reg D  Also, he knows one of the Koch brothers and they may have said something negative about Reg D.

You and Ray are probably having second thoughts about leaving Fortis and opening an office for Genesee  Had I known what the markets had in store for us, I would not have moved ahead with this plan either.  I will continue to try to raise new money for the fund and I am sure that you guys will do the same. Despite our recent setback our track record is still quite good, and I seriously doubt that aggressive investors will all abandon this strategy  We all have to work together, and not as two competing groups, to see ourselves through these difficult times  Our existing portfolio is what it is, and I solicit your opinions on how to best exit each position  One request that I have made several times to you is for a memorandum on possible strategies for playing the Quokka situation  I can see plenty of potential trouble ahead when we try to exit that position, and we had better have in place a well thought out exit strategy

Thanks for your memos
Best regards,
Don Morken

